# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

Michael A. Bailey, et al.,

               Plaintiffs,

    v.

AK Steel Corporation,

               Defendant.

Case No. 1:06cv468

Judge Michael R. Barrett

## ORDER

This matter is before the Court on Plaintiffs' Motion for a Preliminary Injunction (Doc.11) which was filed on August 4, 2006.  Defendant, AK Steel Corporation, filed a Memorandum in Opposition (Doc. 17) on August 25, 2006.  Plaintiffs' Reply Memorandum of Points and Authorities (Doc. 21) was filed on September 6, 2006.  Defendant filed a Sur-Reply Memorandum (Doc. 23) on September 8, 2006.  A hearing was held before this Court on September 13, 2006.  Both parties were present at the hearing and presented oral argument to the Court.  This matter is now ripe for review.  For the reasons set forth below, the Court finds that Plaintiffs' Motion for a Preliminary Injunction is well taken and is hereby GRANTED.

PROCEDURAL BACKGROUND

On July 18, 2006 Plaintiffs filed a Class Action Complaint for Breach of Labor Contracts and for Breach of ERISA Welfare Plans (Doc. 1) against AK Steel Corporation.[1]

---

[1]Prior to the filing of the Complaint in this matter, AK Steel Corporation filed a Declaratory Judgment action in Dayton, Case Number, 3:06cv171 against ARMCO Employees Independent Federation, Inc. and various officers and trustees of ARMCO relative to the issues currently before this Court.  AK Steel later added the Plaintiffs in this matter as parties in the Dayton action.  However, AK Steel filed a Notice of Voluntary Dismissal (Doc. 15) of that action on August 22, 2006.

The Court has jurisdiction over this matter pursuant to Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, Section 502 of the Employment Retirement Income Security Act of 1974, as amended (ERISA), 29 U.S.C. §1132, and 28 U.S.C. § 1331, as the claims arise under the laws of the United States.  Plaintiffs represent a proposed class of approximately 4500 individuals (Doc. 1, ¶9, Doc. 14, ¶9).   The Complaint consists of two classes.  Class I consists of retirees and their spouses, surviving spouses and/or dependents who retired from AK Steel Corporation, or its predecessors, under certain collective bargaining agreements covering hourly production, maintenance and service employees.   Class II consists of retirees and their spouses, surviving spouses and/or dependents who retired from AK Steel Corporation, or its predecessors, under certain collective bargaining agreements covering salaried non-exempt employees.  (Doc. 1, ¶2).  The Motion for Preliminary Injunction is limited to only the collective bargaining agreements covering hourly production, maintenance and service employees.

UNDERLYING FACTS

The Plaintiffs (and the proposed class) are individuals who retired between 1950 and the present under various collective bargaining agreements negotiated between Armco Employees Independent Federation, Inc. ("AEIF" or "the Union")[2] and Defendant AK Steel Corporation ("AK Steel" or "the Company") or its predecessors (Doc. 1, ¶¶1 and 2, Doc. 14, ¶1).  Each collective bargaining agreement ("CBA") was a multi-year agreement that provided the terms and conditions of employment for employees represented by the Union

---

[2]Since the filing of the Motion for Preliminary Injunction AEIF has affiliated with the International Association of Machinists and Aerospace Workers, ALF-CIO and is now called IAM Local 193 of the International Association of Machinists and Aerospace Workers, ALF-CIO.  (Second Daley Decl., ¶2).

(Doc. 1, ¶6, Doc. 14, ¶6).  Prior to or upon the expiration of the then current CBA the Union and AK Steel would negotiate the terms of a new CBA.  Each CBA provides for health insurance benefits for active and retired employees of AK Steel.  Each CBA incorporates by reference the health benefit plan, collectively known as the "Insurance Benefit Plan" ("the Plan")(Doc. 1, ¶8, Doc. 14, ¶8).  The Insurance Benefit Plan includes medical, prescription, dental, vision, Medicare subsidy benefits, life insurance and related benefits for the active and retired employees and their spouses and dependents.  This Plan is provided at virtually no cost to the retirees (Doc. 1, ¶9, Doc. 14, ¶9).

The most recent CBA expired on February 28, 2006.  Unfortunately, the Union and AK Steel were unable to come to an agreement on a new CBA.  AK Steel locked out its union represented employees on March 1, 2006 following a vote a by an overwhelming majority of the union represented employees to authorize a strike.  (Perkins Decl. ¶ 3 and 4).  On June 1, 2006 AK Steel announced that it was terminating the Insurance Benefit Plan for retirees effective October 1, 2006 and implementing a new retiree insurance program.  The new retiree insurance program includes monthly premiums to be paid by the retirees.  It also terminates the dental, vision and medicare subsidy benefits, and reduces the life insurance benefits for retirees.  Pre-Medicare eligible retirees and dependents may keep their current medical and prescription drug benefits for a $55 per person per month premium.  Medicare eligible retirees and dependents must pay a $163 per person per month premium plus $88.50 per person per month for Medicare Part B.  On January 1, 2007 the cost and benefits will change again. (Simon Decl. Ex. 7).

Plaintiffs allege that AK Steel is not permitted to change the Insurance Benefit Plan as to retirees as those benefits vested upon the retiree's retirement.  AK Steel alleges that

it does, in fact, have the right to terminate benefits and that the benefits are not vested for retirees.

LAW AND ANALYSIS

In determining whether to grant injunctive relief, the trial court must balance and weigh the following factors: (1) the plaintiffs' likelihood of success on the merits, (2) the existence of irreparable harm to the plaintiffs in the absence of an injunction, (3) whether others will be harmed if an injunction is issued, and (4) the public's interest in issuing an injunction. *McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997). These factors are not prerequisites to issuing an injunction but factors to be balanced. *See Unsecured Creditors' Comm. of DeLorean Motor Co. v. DeLorean*, 755 F.2d 1223, 1229 (6th Cir. 1985). The Court, however, should not issue a preliminary injunction where there is no likelihood of success on the merits. *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997).

I.     Plaintiffs likelihood of success on the merits.

Retiree insurance benefits are welfare benefit plans under ERISA. *Maurer v. Joy Techs., Inc.*, 212 F.3d 907, 914 (6th Cir. 2000). ERISA does not require that retiree insurance benefits be vested but such benefits may vest if the parties agree to vesting. *International Union, United Auto., etc. v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983). Whether retiree insurance benefits continue beyond the expiration of the collective bargaining agreement depends upon the intent of the parties. *Id.*, *citing John Wiley & Sons v. Livingston*, 376 U.S. 543, 555, 11 L. Ed. 2d 898, 84 S. Ct. 909 (1964). *See also Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 578 (6th Cir. 2006) (To prove this, the

4

plaintiffs must show that the defendant and the union intended to include a right to lifetime benefits when they negotiated the CBAs at issue). The basic principles of contract interpretation are appropriate for determining the parties' intent in collective bargaining agreements. *Yard-Man, Inc*., 716 F.2d at 1479. The court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent. *Id. citing Kellogg Co. v. NLRB*, 457 F.2d 519, 524 (6th Cir. 1972). The Court should also look to the context which gave rise to the inclusion of the clause being interpreted and interpret each provision in question as part of the integrated whole while considering the relative positions and purposes of the parties. *Id. See also Kellogg Co., supra*, 457 F.2d at 524; *Florida Canada Corp. v. Union Carbide & Carbon Corp.*, 280 F.2d 193 (6th Cir. 1960). The terms of the collective bargaining agreement shall be construed so as to render none nugatory and avoid illusory promises. *Yard-Man, Inc*.,716 F.2d at 1480. Where ambiguities do exist, the court may consider other words and phrases in the collective bargaining agreement for guidance. *Id.* The Court should also "review the interpretation ultimately derived from its examination of the language, context and other indicia of intent for consistency with federal labor policy. This is not to say that the collective bargaining agreement should be construed to affirmatively promote any particular policy but rather that the interpretation rendered not denigrate or contradict basic principles of federal law." *Id.*

A.      Article XVIII, Section C.

The Company asserts that it has the right to terminate the Insurance Benefits Plan based on the following language contained in the CBAs at Article XVIII, Insurance, Section C - Termination:

5

> Notwithstanding the provisions of Article XXVI of this Agreement [the general duration provision which provides for an expiration date of February 28, 2006], the Insurance Benefits Plan shall remain in effect until July 31, 2006, and thereafter subject to the right of either party to terminate on 120 days' written notice served on or after April 3, 2006.[3]

AK Steel contends that this is a specific durational clause that is clear and unambiguous. Despite assertions to the contrary by AK Steel, the Court finds this clause to be ambiguous and the intent of the parties to be unclear. The clause "the Insurance Benefits Plan shall remain in effect until July 31, 2006" could be read to mean, as the Defendants assert, that the Plan and the underlying benefits remain in effect until such date as to current employees and as to previously retired employees. Or, it could be read to mean, as Plaintiffs assert, that the Plan and the underlying benefits remain in effect until such date as to current employees only. This ambiguity requires a review of other provisions of the CBA for evidence of intent and an interpretation that is consistent with the entire CBA agreement. *See Yard-Man*, *supra* at 1480.

The Sixth Circuit in *Yolton v. El Paso Tenn. Pipeline Co.,* 435 F.3d 571(6th Cir. 2006) addressed a similar fact pattern to that that is before this Court. In *Yolton* the relevant durational clause in the CBA stated "The group insurance plan agreed to between the parties will run concurrently with this Agreement and is hereby made a part of this Agreement." Basically, the group insurance plan would expire at the same time the CBA expired. The Defendants in *Yolton*, like AK Steel here, argued that this clause was clear and explicit language demonstrating that health insurance benefits were not intended to vest and were only to last as long as the CBA. The district court in *Yolton* found that "a

---

[3]This language is identical in every previous CBA provided to the Court, except for the dates.

6

number of courts have held that such general durational provisions only refer to the length of the CBAs and not the period of time contemplated for retiree benefits." *Yolton, supra* at 580, *citing Yolton v. El Paso Tenn. Pipeline Co., 318 F. Supp. 2d 455, 467*.  "Absent specific durational language <u>referring to retiree benefits themselves</u>, courts have held that the general durational language says nothing about those retiree benefits. *Id*. (emphasis added); *see also Yard-Man*, 716 F.2d at 1482; *Schalk v. Teledyne, Inc.*, 751 F. Supp. 1261, 1265 (W.D. Mich. 1990), *aff'd* 948 F.2d 1290 (6th Cir. 1991) ("the existence of a general durational clause which provide[s] that the collective bargaining agreement should remain in effect until a certain date does not demonstrate an intent that all benefits described in the agreement also terminate[ ] on that date.").  The Court went on to state:

> The durational language only affects future retirees -- that is, someone who retired after the expiration of a particular CBA would not be entitled to the previous benefits, but is rather entitled only to those benefits newly negotiated under a new CBA. Thus, the retirement package available to someone contemplating retirement will change with the expiration and adoption of CBAs, but someone already retired under a particular CBA continues to receive the benefits provided therein despite the expiration of the agreement itself.

*Yolton, supra* at 581.  This is the precise argument made by Plaintiffs in the instant matter.

Defendants, however, contend that *Yolton* is distinguishable and argue that "the termination clause relied upon by the company in *Yolton* was a general durational clause and the termination clause relied upon here by AK Steel is a specific durational clause for insurance benefits.  (Doc. 17-1 and 23).  The Court does not see the distinction.  In *Yolton*, the durational clause stated, "The <u>group insurance plan</u> agreed to between the parties will run concurrently with this Agreement and is hereby made a part of this Agreement."

(emphasis added). Compare the *Yolton* clause to the durational clause at issue here: "...the <u>Insurance Benefits Plan</u> shall remain in effect until July 31, 2006, and thereafter subject to the right of either party to terminate on 120 days' written notice served on or after April 3, 2006" (emphasis added). Both clauses refer to the plan and not specifically to benefits as AK Steel alleges. Furthermore, Article XVIII of the CBA makes no reference at all to retiree benefits. *See Yolton,* 435 F.3d 571 at 581*; Yard-Man*, 716 F.2d at 1482. *See also Maurer*, 212 F.3d 917-918 ("even though the clause makes clear that the insurance agreement terminates after three years, case law indicates that the termination of the agreement does not indicate the termination of benefits created by it, if the benefits are intended to vest.") The only distinction that exists is that the insurance plan in *Yolton* terminated at the same time as the CBA. Whereas in the present matter, the insurance plan terminated several months after the expiration of the CBA. The Court does not find this distinction to be relevant to its determination. Further, finding an intent to vest would not render Article XVIII nugatory but would instead clarify its meaning: that the right to terminate health insurance benefits is applicable to active employees only.

B.    <u>Article XVII, Section C</u>.

Additionally, the language cited above at Article XVIII, Section C is virtually identical to the Article XVII, Section C - Termination as it pertains to Pensions. Article XVII, Section C states as follows:

> Notwithstanding the provisions of Article XXVI of this Agreement, the Noncontributory Pension Plan shall remain in effect until July 31, 2006, and thereafter subject to the right of either party to terminate on 120 days' written notice served on or after April 3, 2006.

8

The Plaintiffs argue that since Section C - Termination in both Article XVII and XVIII are the same that this demonstrates an intent to vest because pension plans are subject to mandatory participation, vesting and funding. *See* 29 U.S.C. § 1051. The Plaintiffs further argue that this supports their argument that Section C is meant to apply to current employees only. Otherwise, Section C in Article XVII would be nugatory since pension plans are vested and can not be terminated unilaterally by the Company despite the termination language included in Section C.

AK Steel counters that Section C of Article XVII and Article XVIII (as well as Article XIX Supplemental Unemployment Benefits) have been in the CBAs since 1969, five years prior to the enactment of ERISA in 1974 and the vesting of pension plans. However, AK Steel ignores the fact that pension plans could be vested pre-ERISA and that in the numerous subsequent CBAs that language was never deleted or changed. If the Court is to adopt the rationale of AK Steel, Section C of Article XVII would be nugatory as it relates to retirees. *See Yard-Man, Inc.*, *supra,* 716 F.2d at 1480 (The terms of the collective bargaining agreement shall be construed so as to render none nugatory and avoid illusory promises).

Again, this Court relies on *Yolton*. In *Yolton*, the durational clause relating to the insurance plan was virtually identical to the durational clause relating to the pension plan.[4] The plaintiffs in *Yolton*, like the Plaintiffs here, argued that "because pension plans are vested benefits and because the CBA uses the same durational language for pension

---

[4] With respect to pensions, the CBA stated "The pension plan agreed to between the parties will run concurrently with this Agreement and is hereby made a part of this Agreement."

9

plans that it uses for the health care benefits, the health care benefits also must be vested benefits." *Yolton*, 435 F.3d 571 at 581.  The plaintiffs, in *Yolton,* further argued "that the agreements would not use the same language [as to pensions and insurance] if it had different meanings."  The Court in *Yolton* found that "This argument further bolsters the interpretation noted above that the expiration of a CBA affects only future retirees in the context of benefits."  *Id.*  This Court agrees.  While reviewing "each provision in question as part of the integrated whole," as required by *Yardman*, 716 F.2d at 1479, the use of virtually identical language at Section C - Termination in Article XVII and Article XVIII provides substantial support that the health benefits for retirees vested upon their retirement.

      C.     <u>The Summary Plan Descriptions.</u>

For further support, the Plaintiffs argue that the Court should consider several provisions in the various Summary Plan Descriptions that show an intent to vest the health insurance benefits.  A Summary Plan Description ("SPD") is a plain-language summary of the Insurance Benefits Plan that is used to provide an accurate presentation of the Plan to the retirees.  In fact the introductory page of each SPD states, "This booklet contains a general description of the Armco Steel Company Plan...".  The SPDs may not be negotiated between the Union and the Company but it is meant to provide a generalized description of the Insurance Benefits Plan which is part of the CBA.  See Stewart Decl.,¶ 4, Doc. 1, ¶1, Doc. 14, ¶8).

      1.     <u>Eligibilty.</u>

First, the SPD under "Eligibility" states that  "You will be eligible to participate in the

Armco Steel Company Plan if you are a participant in a pension under the Armco Steel Company Noncontributory Pension Plan...".  (See Simon Dec. Exs. 5(a) p.29, 5(b) p.31, 5(c) p.31, 5(d) p.34 and 5(e) p.89).  The Plaintiffs, relying on *Yolton, supra* and *Golden v. Kelsey-Hayes Co.,* 73 F.3d 648 (6th Cir. 1996), argue that this implies an intent to vest because the sentence ties the health insurance benefits to that of a pension plan and you can not be eligible for the insurance plan unless you are a participant in a pension plan. *See Yolton*, 435 F.3d at 580 (affirming the district court's findings that "[b]ecause the pension plan is a lifetime plan and the health insurance benefits are tied to the pension plan ... the health insurance benefits were vested and intended to be lifetime benefits.") *See also Golden*, 73 F.3d at 656 ("Since retirees are eligible to receive pension benefits for life, the court found that the parties intended that the company provide lifetime health benefits as well.").

> 2.    Coverage after your death.

Second, the SPD under the section titled  "Coverage After Your Death" provides that coverage shall continue for the surviving spouse and dependents after the death of the retiree.  The Plaintiffs argue that this implies "that health benefits are guaranteed for life..." (Doc. 11-2, p. 14).  The only statement relative to termination of such coverage is that a surviving spouse's and dependents' coverage will terminate upon the surviving spouse's remarriage and that "If there is no spouse upon the date of [the retirees] death, or upon the spouse's death or remarriage following such occurrence, the benefits will terminate as of the end of the month for any surviving dependent children."  See Simon Dec. Exs. 5(a) p.32, 5(b) p.34, 5(c) p.34, 5(d) p.37 and 5(e) p.93.  The Plaintiffs again argue that this

11

demonstrates an intent to vest. *See Yard-Man,* 716 F.2d at 1481 ("...it is more reasonable to infer that the spouse-dependent child provision was meant as an exception to the anticipated continuation of benefits beyond the life of the collective bargaining agreement.").

        3.    <u>Medicare Part B</u>.

Next, in a footnote (Doc. 11-2, p.14), Plaintiffs point out that under the CBA and the Pension Plan an employee can retire at the age of fifty-five. This is relevant to the inquiry before the Court because the SPD provides that the Company will pay the Medicare Part B monthly premium for eligible retirees and their dependents (See Simon Dec. Ex 5(d) p. 31).[5] Since the payment by the Company of the Medicare Part B monthly premium could be as far away as ten years for an individual who retired at age fifty-five, this establishes an intent to vest and would be an illusory promise otherwise. *See Maurer v. Joy Technologies, Inc.*, 212 F.3d 907, 916.

        4.    <u>Maintaining Plan Qualification/The 2003 SPD</u>.

Finally, Plaintiffs point the Court to the "Maintaining Plan Qualification" section of the SPD which states "Armco Steel Company, L.P. intends for the plans in this booklet to be a permanent part of its total benefit program. However, the company reserves the right to amend them as necessary to comply with the Internal Revenue Code or future ERISA

---

[5]Medicare is a Health Insurance Program for people 65 years of age and older, some disabled people under 65 years of age, and people with End-Stage Renal Disease.

regulations."[6]  (See Simon Dec. Exs. 5(b) p.37, 5(c) p.37, and 5(d) p.41).  This reservation of rights clause only reserves unto the Company the right to amend the Plan to comply with federal regulations and supports Plaintiffs' contention that the insurance benefits were intended to vest.  It does not give any rights to AK Steel to terminate the plan.

However, the 1999 Plan effective as of November 1, 1999 as amended on January 1, 2003 (the "2003 SPD") includes the following unrestricted reservations of rights:  "AK Steel Corporation has every intention of continuing the Plan, but the company through action of the Benefits Plans Administrative Committee, reserves the right to amend, suspend or terminate the Plan or any premium payments and contributions on your behalf, in whole or in part for any reason.  This may be done without the consent of any employee, beneficiary or any other person"  (2003 SPD, p.99).  AK Steel argues that this language explicitly reserves to it the right to terminate the Plan and that this unrestricted reservation is a restatement of a right that AK Steel has under Article VXIII of the CBA.  Plaintiffs counter that this language was "not negotiated or agreed to by the Union and that AK Steel put it into the Plan arbitrarily, without notification and without consent.  Plaintiffs also question was such a change needed to be made if, in fact as AK Steel alleges, it already had such a right under the CBA.  Plaintiffs further contend that they did not learn about this provision until after the Company announced its plans to termination/reduce health insurance benefits for retirees in June of this year.   Whereas AK Steel, in a supplemental Declaration of Kathy Johnson, asserts that since January 1, 2003 the Company has provided a copy of the SPD that contains this reservation of rights clause to each retiree

---

[6]The 1975 SPD does not contain this language or any reservation of rights language.  The 1999 SPD as amended on January 1, 2003 will be addressed separately.

13

(Doc. 26, ¶2). AK Steel cites to *Maurer v. Joy Technologies, Inc.,* 212 F.3d 907 (6th Cir. 2000), wherein a similar factual situation occurred. In *Maurer* the Court found that the new unrestricted reservation of rights clause was widely publicized and distributed to retirees and that since the Union did not file a timely grievance that the new reservation of rights clause was applicable to those that retired since the creation of such new unrestricted reservation. *Id.* at 919. AK Steel points out that the Union did not file a timely grievance. Plaintiffs counter that *Maurer* is distinguishable as to that holding since the 2003 reservation was not widely publicized and since it was hidden on page 99 of an 110 page document. Plaintiffs further argue it can not be made retroactive to 1999 even if it is found to be applicable to retirees after 2003. Although Plaintiffs' likelihood of success on this particular issue is muddled, when taken on balance with the remainder of this opinion the Court finds that an injunction as to all retirees, including those that retired under the revised SPD, is appropriate.

## 5. Waiver of Post-Retirement Death, Health and Dental Benefit Coverage.

In addition, the Court points to another provision that is of interest on the issue of intent to vest. Section H (1) of the 1990 Plan, page 34, provides for a "Waiver of Post-Retirement Death, Health and Dental Benefit Coverage." This provision provides for a buyout in exchange for the waiver by the retiree of his post-retirement benefits. It does not seem to make sense to the Court that the Company would allow for a buyout of coverage on a plan that they could terminate at the expiration of the CBA, especially since "benefits for retirees are only permissive not mandatory subjects for collective bargaining."

*Yardman*, 716 F.2d at 1482. Thus, the Company would pay $15,000[7] as a lump sum payment for a waiver of health and dental coverage to a retiree who waived his post-retirement coverage compared to a fellow retiree who decided not to waive his post-retirement coverage and who would then be subject to termination at the expiration of the CBA. The Court does not find this to be reasonable unless there is an intent to vest. From the record before this Court, however, it appears that this section is only present in the 1990 Plan.

Based on the foregoing, the Court finds that the Plaintiffs have show a sufficient likelihood of success on the merits.[8]

II.    The existence of irreparable harm to the plaintiffs in the absence of an injunction.

Plaintiffs argue that they will suffer irreparable harm if an Injunction is not issued because the additional costs associated with the new monthly premiums now required by the Company to maintain their health and prescription benefits are too great for the retirees to bear. As the declarations attached to Plaintiffs' motion attest, those retirees (and/or their spouses) are elderly individuals living on a fixed income who risk losing their medical and

---

[7]The lump sum payment for life insurance is equal to 50% of the calculated present value dollar cost to the Company.

[8]AK Steel also argues that because the Union proposed changes to the contract language that would explicitly restrict the right of AK Steel to change the insurance benefits for retirees that the Union has conceded that AK Steel does have the right to change the insurance benefits. What AK Steel fails to mention is that such proposed changes by the Union were made AFTER AK Steel announced its plans to terminate/reduce benefits and AFTER AK Steel had filed a declaratory judgment action in the District Court in Dayton, Ohio. Such proposed changes were made in an attempt to negotiate for a new CBA and to protect retirees that had called the Union asking for help. The Union's proposal actually stated that any changes to retiree benefits would be "subject to approval by current retirees". (See Second Daly Decl., ¶5 and 6). With that all being said, the Court did not consider this argument as it does not need to look beyond the CBA and its incorporated documents on this issue.

prescription cover unless they can find a way to pay the premiums now required by the Company. See Doc. 11-19, Attachments D, E, F, G, H, I , J, K, L and M.  Plaintiffs will also lose all dental and vision benefits, Medicare Part B subsides and a reduction in their life insurance coverage if an Injunction is not issued.  In addition, the Plaintiffs argue that they currently are and will continue to suffer from emotion distress such as uncertainty, anxiety and confusion as they try to figure out what to do.  See Doc. 11-19, Attachment F ¶11-13, Attachment G ¶9-11, Attachment H ¶10, Attachment I ¶11, Attachment J ¶10, Attachment K ¶11, Attachment L ¶10 and Attachment M ¶11.

In support of Plaintiffs' argument, Plaintiffs cite to several district court opinions from this Circuit.  *See Helwig v. Kelsey-Hayes Co.*, 857 F. Supp 1168, 1179 (E.D. Mich. 1994) *aff'd,* 93 F.3d 243 (6th Cir. 1996) (The District Court found that the retirees had demonstrated irreparable harm from the financial hardship that they would suffer due to the changes in their medical plans.  The court stated that "retirees will be forced to choose between needed medical procedures and paying for basic necessities."); *Golden v. Kelsey-Hayes Co.,* 845 F. Supp. 410 (E.D. Mich. 1994) *aff'd* 763 F.3d 648 (6th Cir. 1996) (related case to *Helwig*, *supra* issuing an injunction under the same theory for a different class of workers); *Hinckley v. Kelsey-Hayes Co.,* 866 F. Supp. 1034 (E.D. Mich. 1994)(Because of the added costs associated with the changes made by the company to the health plan, the court found irreparable harm as the retirees would be forced to forego needed medical treatment); and *Schalk v. Teledyne, Inc.*, 751 F. Supp. 1261 (W.D. Mich. 1990) *aff'd*, 948 F.2d 1290 (6th Cir. 1991) (In finding irreparable harm the "[t]he Court recognizes the distinct possibility that retirees living on such limited means might chose to forego necessary

medical treatment if they are required to pay co-pays and deductibles which are obviously well outside their means.").

In response, the Company argues that Plaintiffs have failed to show that any retiree "is in imminent danger of foregoing medical care or losing health insurance" and that "virtually every putative class member has elected to continue with the [new] AK Steel plan" (Doc. 17-1, p.19). The fact that virtually every retiree signed up for the new plan does not persuade the Court that no irreparable harm will occur. As the Court views it, many, if not all of the retirees, have no other option than to sign up for the new plan whether or not they can afford it or not. See Doc. 11-19, Attachment D ¶12, Attachment E ¶11, Attachment F ¶11-13, Attachment H ¶10, Attachment I ¶10-11, Attachment J ¶11, Attachment K ¶11, Attachment M ¶10-11.

AK Steel further argues that Plaintiffs have failed to show that they can be made whole by money damages. In support of this AK Steel cites to two cases where courts refused to grant a preliminary injunction: *Adkins v. American Standard, Inc.,* 2005 WL 2137740 (E.D. Ky. 2005) and *Anthony v. Koch Industries, Inc.*, 2005 WL 3157590 (M.D.N.C. 2005). Both cases held that plaintiffs could be made whole by money damages if they were to succeed on the merits. However, neither *Adkins* nor *Anthony* are from this Circuit and in each case the plaintiffs waited until over two and one-half years and almost one year, respectively, after their benefits were terminated prior to seeking an injunction. This Court does not find either case applicable here as the Plaintiffs here filed suit prior to the termination of their benefits and because the Plaintiffs have demonstrated, by way of Declarations, that AK Steel's actions are causing stress and anxiety to the retirees and/or

17

their spouses. See Doc. 11-19, Attachment F ¶11-13, Attachment G ¶9-11, Attachment H ¶10, Attachment I ¶11, Attachment J ¶10, Attachment K ¶11, Attachment L ¶10 and Attachment M ¶11.

Finally, AK Steel argues that it would be wrong for the Court to grant class-wide injunctive relief and find that the entire putative class would be irreparably harmed at this state in the litigation. AK Steel relies on a case from another circuit, *Adams v. Freedom Forge Corp.*, 204 F.3d 475 (3rd Cir. 2000), which vacated a preliminary injunction as to "all non-testifying plaintiffs," who had not demonstrated a "specific and personal risk of irreparable harm." *Id.* at 491. In *Adams,* the new coverage provided that retirees under age 65 would be required to pay a portion of their premiums which would range from $ 30 to $ 90. Whereas those over age 65 would be able to choose between two different plans: (1) a plan with no premium payments, but a $ 10 co-payment per prescription and a $ 1250 annual limit for drug prescriptions or (2) a plan with monthly premiums ranging from $ 20 to $ 40, a $ 10 to $ 20 co-payment per 30-day supply of prescription drugs, and drug benefits limited to $ 2500 per year. *Id.* at 480.

In response to *Adams*, the District Court in *Yolton*, 318 F. Supp.2d at 472, *aff'd,* 435 F.3d 571 (6th Cir. 2006) stated:

> The present matter is distinguishable from *Adams* in that Plaintiffs are required to contribute $ 501 *per month* to maintain *any* of their retiree health care benefits. While Plaintiffs only present the affidavits of 34 retirees and surviving spouses, the Court can surmise that the putative class members overall cannot afford to contribute such an amount until this case is resolved. Unable to afford the $ 501 premium, Plaintiffs will lose their health care insurance, will not be able to pay for necessary prescription medications, and will not receive all the medical care they need. Reimbursing Plaintiffs for their contributions at the end of the case, therefore, will not afford them relief.

18

In *Adams* there were approximately 136 putative class members that faced a premium payment of $30 to $90 for those under 65 and $20 to $40 plus a co-pay for those over 65. In *Yolton* there were approximately 3700 members facing a premium payment of $501. See *Yolton,* 318 F. Supp.2d at 472-473. In the present matter there are approximately 4500 potential class members. For those that are not Medicare eligible retirees will have to pay a $55 per person per month premium to keep the same health coverage for themselves, their spouses and their dependents. Those that are Medicare eligible must pay a $163 per person per month premium plus $88.50 per person per month for Medicare Part B. Plus all retirees will have their vision and dental insurance terminated which is an additional cost that each retiree must bear to either obtain new vision and dental insurance at their expense or remain uninsured and pay for the services as needed. Furthermore, the cost of the health benefits will likely go up in January, 2007. Charlene Dunn estimates that she will be required to pay $251.50 just to maintain her health insurance (Doc. 11, Attachment D ¶8-9). Ella Vester Henderson estimates that she and her husband will be required to pay $503 just to maintain their health insurance (Doc. 11, Attachment E ¶8-9). Carolyn L. Walker estimates that she would have to pay at least $381 per month for health insurance coverage for herself, her husband and their disabled son (Doc. 11, Attachment F ¶9). However, it does not appear that Ms. Walker included the $88.50 per month per person medicare subsidy for her husband and son. Thus, the Court believes their monthly payment would be $558. These are just a few of the examples provided to the Court by way of the ten Declarations filed with the Court. Although the

19

Court would have liked to have seen more declarations from retirees[9], based on the undisputed facts presented the Court can approximate what the costs will be to each group of retirees (i.e., those over 65 and those under 65). For example, a married retiree (both over age 65) will have to pay $503 per month to maintain their health coverage plus the additional cost necessary to compensate for the lose of dental and vision insurance. Obviously this is the high end of the range of premiums, however, the Court here too can surmise that the putative class members overall cannot afford to contribute such amounts until this case is resolved. *Yolton*, 318 F. Supp.2d at 472. *See also See Helwig v. Kelsey-Hayes Co.*, 857 F. Supp 1168, 1180 (E.D. Mich. 1994) *aff'd,* 93 F.3d 243 (6th Cir. 1996)(the court will take into consideration the irreparable harm faced by putative class members before class certification because of the nature of injunctive relief at this stage of the litigation.).

The Court finds that the Plaintiffs have demonstrated that they will suffer irreparable harm if an injunction is not issued.

III.    Whether others will be harmed if an injunction is issued.

Plaintiffs argue that the harm suffered by the Plaintiffs and proposed class members outweigh any alleged harm to AK Steel. "Plaintiffs and class members in this case - an aged, frail population with extremely limited resources - are losing access to medical care, suffering severe financial hardship which is forcing them to forego life's other basic necessities, and experiencing significant stress, anxiety, confusion and uncertainty as a

---

[9]To require virtually all members of a class of this size to present evidence of each member's harm would be an unreasonable burden to place on the Plaintiffs as well as on this Court.

result of AK Steel's actions" (Doc. 11-2, p.23).

AK Steel, on the other hand, argues "that the enormous costs of continuing the old-style retiree health plan will cause [harm] to AK Steel" (Doc.17-1, p.21). AK Steel points out that it faces a competitive disadvantage because many of its competitors are reorganized steel companies who have no liability for past-negotiated retiree health care benefits due to such obligations being eliminated through bankruptcy proceedings. AK Steel also points out that having to continue to pay the retirees premiums "perpetuates a significant competitive disadvantage on the company which jeopardizes its ability to fund both the insurance benefits for Middletown Works retirees and the insurance benefits of the Company's other retirees and current employees." *Id.* In support of its argument, AK Steel cites to two district court opinions, *UAW v. General Motors Corp.*, 2006 WL 891151 (E.D. Mich. 2006) and *Int'l Union, United Automobile, Aerospace, and Agricultural Implement Workers of American v. Ford Motor Co.,* 2006 WL 1984363 (E.D. Mich. 2006), which recognized that the continued viability of the company was essential to the continued funding of retiree health benefits.[10] In fact, the Court in *Ford*, stated "If the company's financial situation continued to worsen, even to the point of insolvency, retiree medical benefits could be eliminated altogether." *Ford Motor Co.,* 2006 WL 1984363 at *8. This Court also recognizes the problems that the retirees and the current employees would face if AK Steel was insolvent. Obviously, it is in the best interest of all the parties for AK Steel to be able to continue in its operations. However, AK Steel has presented no evidence that it is in such dire straits. On balance, the Court finds that the financial harm, loss of benefits

---

[10]The issue presented before the district courts in *General Motors* and *Ford* was for the approval of the proposed settlements between the retirees and the company.

and emotion distressed caused to the Plaintiffs outweigh any harm that may be felt by the Company since the Company is not being required to pay more than it previously had paid but only to maintain the status quo during the pendency of this litigation.  Other courts in similar cases have found this same balance in favor of the retirees.  *See Helwig v. Kelsey-Hayes Co.*, 857 F. Supp 1168, 1180 (E.D. Mich. 1994)(the harm to the company in reinstating its former retiree benefits does not outweigh the harm to the plaintiffs); *Schalk v. Teledyne, Inc.*, 751 F. Supp. 1261 (W.D. Mich. 1990)(the company's financial loss was outweighed by that of the retirees); *Yolton v. El Paso Tennessee Pipeline Co.,* 318 F. Supp.2d 455 (E.D. Mich. 2003) (the impact on the company of continuing to provide benefits is far less than the burden placed on the retirees if their request for a preliminary injunction is denied).

IV.     <u>The public's interest in issuing an injunction.</u>

Plaintiffs allege that the public interest weighs in their favor.  Plaintiffs claim that Congress, by way of ERISA and the LMRA, clearly set out to protect the interests and expectations of the rights of employees guaranteed by welfare benefit plans.  ERISA provides that the policy behind it is to "protect the interests of participants in employee benefit plans . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, . . . by providing for appropriate remedies, sanctions, and ready access to the Federal Court." 29 U.S.C. § 1001(b).  The "public interest lies in protecting the legitimate expectations of retirees that their health insurance will be provided for the rest of their lives." *Helwig v. Kelsey-Hayes Co.*, 857 F. Supp 1168, 1181 *citing Schalk,* 751 F. Supp. at 1268.

Defendant claims that the public interest lies in ensuring that AK Steel stays competitive. AK Steel points out that it is the largest private employer in Butler County and that the "inconvenience from these modest modifications [to the retiree benefits] is not nearly as severe as the hardship that would result if AK Steel became unable to fund retiree health care altogether" (Doc. 17-1, p.23).

The Court finds that the public interest weighs in favor of Plaintiffs. The "public interest lies in protecting the legitimate expectations of retirees that their health insurance will be provided for the rest of their lives." *Helwig v. Kelsey-Hayes Co.*, 857 F. Supp 1168, 1181 *citing Schalk,* 751 F. Supp. at 1268.

V.    Security Bond.

Pursuant to Rule 65(c), no "preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered" by defendant. Fed. R. Civ. P. 65(c). A district court must expressly consider the question of requiring a bond before issuing a preliminary injunction. *Roth v. Bank of the Commonwealth*, 583 F.2d 527 (6th Cir. 1978). The amount of security required and whether a bond is needed is up to the discretion of the district court. *Id.* at 539. *See also, Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995)("While we recognize that the language of Rule 65(c) appears to be mandatory, and that many circuits have so interpreted it, the rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security.").

Despite Plaintiffs clear request in their Motion for a waiver of the bond requirement

23

or a nominal bond (Doc. 11-2, p26-28), AK Steel has not responded to this request or even provided an estimate of what it will cost the company to continue with the benefits after October 1, 2006. Although the Court is aware that the cost to AK Steel to continue the retiree benefits would be expensive, it is just not clear from the record what this amount would be. Therefore, based on the circumstances of this case, including the age and financial means of the Plaintiffs and that Plaintiffs have shown a strong likelihood of success on the merits, the Court orders that the injunction issue without bond. *See also, Cole v. Arvinmeritor, Inc.,* 2005 WL 3502182 (E.D. Mich. 2005) ("Based on factors such as retirees' 'financial condition,' the 'likelihood of their success on the merits,' Defendant's 'admission of its obligation,' and the public interest, courts may grant preliminary injunctions requiring continuation of collectively-bargained health benefits with no bond or with a nominal bond. *See Mamula v. Satralloy, Inc.,* 578 F. Supp. 563, 579 (S.D. Ohio 1983) (no bond due to retirees' impecunious financial conditions and likelihood of success); *Warner v. Ryobi Motor Prods. Corp*., 818 F. Supp. 907, 909 (D. S.C. 1992) ($ 250 bond where a 'great number' of the retiree plaintiffs had limited assets and 'a strong likelihood of prevailing.')."

VI.   Conclusion.

The Court hereby GRANTS Plaintiffs' motion for a preliminary injunction ordering AK Steel not to terminate the health benefits, including the dental, vision, medicare part B subsidy and life insurance benefits, to retirees, surviving spouses and dependents and to maintain the status quo. Plaintiffs have demonstrated that they will likely prevail on the merits, that they will suffer irreparable harm absent an injunction, that the harm suffered

24

by the Company as a result of an injunction would be outweighed by the harm suffered by the Plaintiffs without such relief, and that the injunction is in the public's interest.

**IT IS SO ORDERED.**

s/Michael R. Barrett
Michael R. Barrett, Judge
United States District Court