UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| MICHAEL A. BAILEY, *et al.*, Individually and on behalf of all others similarly situated, | Case No. 1:06-cv-468 |
| Plaintiffs, | Magistrate Judge Timothy S. Black |
| vs. | |
| AK STEEL CORPORATION, | |
| Defendant. | |

## ORDER
## GRANTING FINAL APPROVAL OF THE SETTLEMENT AGREEMENT

The Court shall give final approval to a settlement agreement of a class action if, following a hearing, the Court determines that the settlement is "fair, reasonable and adequate." Federal Rule of Civil Procedure 23(e)(1)(C). In making this determination, the Court evaluates the proposed class action settlement in light of the general federal policy favoring the settlement of class actions. *IUE-CWA v. General Motors Corp.*, 238 F.R.D. 583, 593 (E.D. Mich. 2006).

Several factors guide the Court's inquiry into whether or not the proposed settlement agreement is fair, reasonable and adequate, including:

1. the likelihood of success on the merits;
2. the complexity, expense and likely duration of the litigation;
3. the amount of discovery engaged in by the parties;
4. the opinions of class counsel and class representatives;
5. the risk of fraud or collusion;
6. the reaction of absent class members; and
7. the public interest.

*UAW v. General Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007).

The fundamental question "is whether the parties are using settlement to resolve a legitimate legal and factual disagreement." *Id.* at 632.

The Court's role "is not to decide the merits of the case or resolve unsettled legal questions," and is "not to decide whether one side is right or even whether one side has the better of the arguments," but it "is rather to weigh the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement." *Id.* at 631-32. In assessing the settlement, the Court must determine "whether it falls within the range of reasonableness, not whether it was the most favorable possible result in the litigation." *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 319 (N.D. Ga. 1993) (citations omitted).

The burden of showing fairness is on the proponents of the settlement. *In re General Motors Corp. Pick Up Truck Fuel Tank Products Liability Litig,* 55 F.3d 768, 785 (3d Cir. 1995). Moreover, "whether a settlement is fair, reasonable and adequate must be evaluated by examining the settlement in its entirety and not as isolated components ... [and] the court does not have the power to change [any of] the terms of the proposed settlement which it may not like." *Enterprise Energy Corp. v. Columbia Gas Transmission Corp.,* 137 F.R.D. 240, 245-46 (S.D. Ohio 1991).

Here, evaluated under the applicable standards, the proposed settlement agreement is fair, reasonable and adequate.

    A.    The Plaintiffs' Likelihood of Success At Trial and Upon Appeal Is Not Overwhelming.

"The likelihood of success... provides a gauge from which the benefits of the settlement must be measured." *General Tire & Rubber Co. Sec. Litig.,* 726 F.2d 1075, 1086 (6th Cir. 1894). "The ultimate question... is whether the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued." *UAW v. General Motors Corp.,* 2006 WL 89115 at *15 (E.D. Mich. 2006), *aff'd* 497 F.3d 615 (6th Cir. 2007). "It is neither required, nor is it possible for a court to determine the settlement is the fairest possible resolution of the claims of every individual class member; rather, the settlement, taken as a whole, must be fair, adequate, and reasonable." *Id.*

If this case proceeded to trial, plaintiffs' burden would be to show that under the applicable collective bargaining agreements and plan documents that their benefits are vested for life. "To vest benefits is to render them forever unalterable." *Sprague v. General Motors Corp.,* 133 F.3d 388, 400 (6th Cir. 1998) (en banc). If the applicable collective bargaining agreement and plan documents do not show that the benefits are "forever unalterable," plaintiffs would lose at trial. And the Company could terminate all benefits.

-2-

AK Steel has vigorously argued throughout this litigation that the collective bargaining agreements have always stated that retiree insurance benefits can be terminated. The Company argues that the insurance article in the collective bargaining agreements (the "CBA") has remained essentially the same since 1969, and it expressly provides for the possible termination of retiree insurance benefits.

For example, Section C of the 1969 CBA states:

Section C. – Termination: Notwithstanding the provisions of Article XXVI of this Agreement [the general duration provision], the Insurance Benefits Plan shall remain in effect until July 31, 2006 and thereafter subject to the right of either party to terminate upon 120 days' written notice served on or after April 3, 2006.

If this contractual language is clear and unambiguous and permits AK Steel to terminate the retiree insurance benefits plan under the circumstances presented here, it does not matter what individuals were told upon retirement. *Sprague v. General Motors Corp., supra,* 133 F.3d at 402-03.

AK Steel argues that the contractual provision permitting either party to terminate the retirees insurance benefits plan (the "IBP") upon giving 120 days written notice was designed to prevent either party from terminating the IBP until at least five months after expiration of the collective bargaining agreement, thereby timely permitting a new CBA to be negotiated. The purpose of this lag-time provision was to protect retirees benefits while a new CBA was being negotiated. The parties' sense was that the Company always wanted a new contract to avoid a work stoppage and that the Company would always, (and did for decades), accept a new CBA which continued to provide retirees their benefits.

According to AK Steel, the parties' failure in 2006 to achieve a new CBA for more than 120 days after the old CBA had expired presented to the Company, in its words, "a one-of-a-kind chance" – "For the first time since the 1969 language was added, the parties were without a contract long enough that the lag-time provision did not prohibit the Company from unilaterally changing retiree insurance benefits."

AK Steel further argues that it expressly called additional attention to its already-existing right of termination with the publication of the 2003 Summary Plan Description (the "SPD"). That document states that:

AK Steel Corp. has every intention of continuing the Plan, but the Company through the action of the Benefits Plan Administration Committee reserves the right to amend, suspend, or terminate the Plan or any premium payments or contributions on your behalf in whole or in part for any reason. This may be done without the consent of any employee, beneficiary or other person.

-3-

The union never filed a grievance over this reservation of rights language in the 2003 SPD. And the law in this circuit may be that the failure to grieve renders subsequent objections waived. *Mauer v. Joy Technologies, Inc.*, (212 F.3d 907, 919 (6th Cir. 2000). In light of this law, and although issuing a preliminary injunction to maintain the status quo, Judge Barrett found that the claim of any class member who retired after 12/31/02 (almost a third of the class) was "muddled."

Accordingly, given the express language of the collective bargaining agreement and plan documents, plaintiffs' likelihood of success on the merits at trial, and upon appeal, was not overwhelming.

B. Continued Litigation Would Be Complex, Expensive, and Lengthy.

If this case were to continue in litigation, the parties would likely experience major expense and delay. The history of this case evidences that it would continue to be complex, expensive, and lengthy. The parties have vigorously litigated this case for well over a year prior to negotiating a settlement. The parties vigorously litigated through completion the entry of a preliminary injunction in the trial court, then vigorously litigated the issue in the court of appeals for more than a year, ultimately dismissing it in light of the settlement agreement. Moreover, the parties have not yet filed dispositive motions, no less prepared for trial, pre-trial and post-trial briefing, and an inevitable appeal.

Based on the parties' demonstrated willingness to litigate this case vigorously at both the trial and appeals court levels, the scope and pace with which the case has proceeded to date, and the posture of the case at the time of settlement, there can be no doubt that the continued litigation of this case would require the parties to expend significant additional resources.

C. This Case Had Progressed to an Advanced Stage
With Discovery Completed.

Notwithstanding the long road ahead in the absence of a settlement agreement, this case had proceeded through extensive discovery before the settlement was reached. The plaintiffs and the defendant served initial disclosures, provided detailed answers to written questions, and exchanged thousands of pages of information responsive to each party's discovery requests. The parties have also taken numerous depositions, including those of each class representative as well as several company officials. This substantial discovery has afforded the Court and the parties "a clear view of the facts and legal issues involved, as well as the strengths and weaknesses of the parties' positions." *Manners v.*

-4-

*American Gen. Life Ins. Co.*, 1999 WL 33581944 at *21 (M.D. Tenn. 1999) (citing *In re Dunn & Bradstreet Serv. Customer Litig.*, 130 F.R.D. 366, 371 (S.D. Ohio 1990)). Moreover, beyond the formal discovery described above, the parties here have also engaged in substantial informal discovery throughout the settlement negotiations. Both the formal and informal discovery conducted in this case demonstrates that the parties reached a settlement based on a full evaluation of the strengths of their cases and the advantages of settlement.

D. The Judgment of Experienced Counsel Supports Approval of the Settlement.

"Generally, courts will give deference to plaintiffs counsel's determination to settle a case." *Berry v. School District,* 184 F.R.D. 93 104 (W.D. Mich. 1998). And courts are particularly likely to defer to the judgment of experienced trial counsel when, as in this case, significant discovery has been completed. *Williams v. Vukovich*, 720 F.2d 909, 992-23 (6th Cir. 1983); *Bronson v. Bd. of Educ.,* 604 F. Supp. 68, 73 (S.D. Ohio 1984).

This Court cannot ignore plaintiffs' attorneys' affirmation that: "class counsel is firmly convinced, based on past experience in on their extensive investigation and analysis in this case, that the proposed settlement is fair and reasonable and adequate."

The judgment of experienced counsel supports approval of the settlement.

E. The Settlement Is the Product of Arms-Length Negotiations.

As a threshold matter, "courts presume the absence of fraud or collusion, unless there is evidence to the contrary." *UAW v. General Motors Corp.*, 2006 WL 891151, at *21 (E.D. Mich. 2006) (citations omitted). No such evidence exists in this case. Moreover, where the Court is involved in helping the parties settle a case, there is "no risk of fraud or collusion among the parties." *Moran v. Wunderlich*, 2007 WL 3005235, at *2 (S.D. Ohio 2007); *see also In Re Delphi Corp. Securities, Derivative & ERISA Litigation*, 2008 WL 125798, at *13 (E.D. Mich. 2008). And, ultimately, "the primary test of collusion is whether the proposed settlement itself is fair, adequate, and reasonable." *White v. Morris,* 811 F. Supp. 341, 343 (S.D. Ohio 1992); *see also Bowling v. Pfizer, Inc.,* 143 F.R.D. 141, 152 (S.D. Ohio 1992).

The Court is absolutely confident that the settlement agreement arose out of arms-length negotiations, much of it conducted in the presence of the Court, free of any nefarious influences. This finding supports approval of the settlement.

-5-

F.  The Settlement Supports the Public Interest.

"There is a strong public interest in encouraging settlement of complex litigation and class-action suits because they are notoriously difficult and unpredictable and settlement conserves judicial resources." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508 (E.D. Mich. 2003 (citing *Granada Investments, Inc. v. DWG Corp.*, 962 F2d 1203, 1205 (6th Cir. 1992). Moreover, the public interest clearly favors the providing of meaningful health insurance coverage for as much of the population is possible. Here, the VEBA is anticipated to provide thousands of retirees with high-quality health care at relatively reasonable cost for the rest of their lives. Without the VEBA's assurance of these benefits, this aging population would be at risk of suffering significantly reduced health insurance, or no health insurance at all. Accordingly, the public interest favors the settlement.

G.  The Objections to the Settlement Agreement Are Unavailing.

"Although the court should consider objections to the settlement, the existence of objections does not mean that the settlement is unfair ... [and] it is clear under the applicable law that even majority opposition to a settlement cannot serve as an automatic bar to a settlement that a district judge, after weighing all the strengths and weaknesses of the case and the risk of litigation, determines to be manifestly reasonable. *In re Telectronics Pacing Sys., Inc.*, 137 F. Supp.2d 985, 1018 (S.D. Ohio 2001). In an opinion approving settlement of a similar case involving allegedly vested retiree insurance benefits, another United States judge observed that "it would not be surprising for a settlement of this kind to produce an avalanche of objections." *Rexam v. United Steel Workers of Am.*, 2007 WL 2746595, at *5, 7 (D. Minn. 2007).

In this case, of the 4,872 class members, some 229 (4.7%) filed timely objections to the settlement agreement. By the February 10, 2008 fairness hearing, the class administrator had received a total of 446 objections from class members (9.2%). Some objected not to the terms of the settlement, but only to the process, *i.e.*, they were not told of the settlement negotiations while they were ongoing, and were not given a right to vote on the settlement. Others objected simply because they said they believed that their benefits could not be reduced, without any apparent deference to the risks faced in the litigation. The objections, nonetheless, were heartfelt, serious, substantial, and extensive. Accordingly, the Court conducted a fairness hearing over a day and a half which provided for live testimony from expert witnesses, as requested by objectors' counsel. And having conducted that hearing, and having reviewed the extensive written submissions, the Court responds succinctly to the most common objections.

- Is the VEBA sufficiently funded?

Under the proposed settlement agreement, AK Steel will transfer cash payments of $663 million to the VEBA. The first payment of $468 million will be made within two days after the settlement is approved, followed by three annual payments of $65 million. The present value of these payments is $638 million. The question presented is whether this $663 million will be sufficient funding to provide the anticipated healthcare to the retirees over their lifetimes.

Plaintiffs retained a large, national, experienced actuarial and consulting firm – The Segal Company – to provide an actuarial analysis based on AK Steel data to assist plaintiffs in settlement negotiations. Plaintiffs, with the assistance of The Segal Company, determined the general level of benefits that these payments would sustain over the lifetimes of the retirees, and a specific schedule of benefits was developed. The Segal Company concluded that: "If managed properly, the VEBA should neither run out of money, nor have excess money left over."

Segal also prepared a report setting forth the assumptions used in the analysis performed for plaintiffs. The report summarizes the results of Segal's valuation and includes a projection of VEBA expenses, number of participants, asset level, and present value of benefits for the expected lives of all class members. The report accounts for projected inflationary increases in health care costs and the effect on funding levels. It shows the ratio of assets to the present value of benefits and demonstrates that at the time the final payment is made by a AK Steel in 2011 the assets will exceed the present value of benefits by 3.5%. If all assumptions are met, this ratio will gradually increase. And thus the VEBA would not run out of money.

The principal objection to the valuation of the VEBA is that the discount rate assumption used in assessing the VEBA's plan of benefits should have been 5% rather than 7%. However, plaintiffs' experts have shown that the 7% rate is based on sound actuarial and investment analysis, and that it is achievable under a reasonable investment portfolio assumption. Given the relatively long-time horizon of 40 to 50 years during which the VEBA will likely be operating, the 7% assumed funding rate is reasonable and achievable through relatively common investments in such vehicles as stocks and bonds without subjecting the VEBA to excessive or imprudent risk. Two retiree health fund VEBA's recently proposed by Ford and General Motors and the United Auto Workers assume a 9% rate of return on VEBA assets.

The risk assumed by the VEBA is a reasonable, measured one, and it must be balanced against the risk of a partial or complete loss of all benefits due to an unfavorable decision at trial or due to a future economic failure by AK Steel.

Accordingly, the objection that the VEBA is underfunded is not well taken.

- Why compromise if the Company is not going bankrupt and, in fact, is having its best year ever?

AK Steel is not on the verge of bankruptcy and will not go bankrupt if the settlement is not approved. Obviously, the Company would not be a financial position to contribute $663 million to the VEBA if the Company were struggling financially.

However, the Court is cognizant of the history of the U.S. economy and the incredible upheaval which has occurred in the basic steel industry. A downturn in the steel industry from 1999 through 2003 caused more than 40 steel companies to declare bankruptcy, including, among others, LTV Steel Corporation, Bethlehem Steel Corporation, and National Steel Corporation. The human dimensions of these failures were vast as these bankruptcies left more than 250,000 retirees without any medical insurance whatsoever from their former employers. The day the 95,000 retirees and dependents of Bethlehem Steel lost their health care and life insurance benefits came to be known as "Black Monday 2003."

AK Steel has not been excluded from the steel industry cycles and their devastation. Just a few years ago, in 2002 and 2003, AK Steel itself teetered on the brink of bankruptcy. In 2003, AK Steel reported a loss of $560 million, and its stock price slid to historic lows, at one point reaching a nadir of $1.91 per share. While its stock price has risen since that date, and reached a new high in October 2007 of $53.21, the stock has since retreated, trading as low as $39.21 on January 2, 2008. AK Steel remains subject to intense competitive pressures, including the massive new international steel company, Arcelor-Mittal. Mittal acquired International Steel Group ("ISG"), which had been formed from the assets of a number of failed or bankrupt U.S. and North American steel companies. Of significance here, ISG had acquired these entities and facilities only after they had shed their pension and retiree health liabilities.

The volatile nature and history of the basic steel industry, and the recent history of numerous economic failures and the loss of health benefits for a quarter to a half million retirees and dependents, militates toward accepting $663 million in cash from AK Steel now ... rather than hoping and praying that the company will continue to operate profitably over the next 40-50 years.[1]

---

[1] If the wager were whether AK Steel will continue in business profitably enough to fund free benefits to the retiree class members for their lifetimes vs. whether there will be enough money in the VEBA to fund the proposed plan benefits for the retiree class members for their lifetimes, many would be reluctant to bet on the company.

-8-

The 2007 profitability of AK Steel offers a singular moment in time to fund the retirees' benefits securely. It therefore militates toward approval of the settlement agreement.

- Why compromise if the retirees possess benefits which are vested for life?

Many of the objectors primarily complain that their right to free lifetime health care benefits is inviolate, and that no settlement of their right to these benefits should be approved. However, these objections fail to acknowledge any degree of risk of losing at trial, and the Court has already addressed this unsubstantiated position at the outset of this Order. Stated bluntly, plaintiffs ran a substantial risk of losing all benefits at the end of this litigation, and they are well served in snagging $663 million in cash now against an unresolved and unsecured claim to $1 billion. When present value is considered, the parties are settling at 70% of AK Steel's potential liability.

- Is there collusion or fraud here?

There is not a scintilla of evidence suggesting that this settlement agreement is the result of any collusion or fraud. Judge Barrett's active and ongoing involvement in the settlement negotiations ensures the absence of fraud or collusion. While many objectors may validly dislike the proposed settlement agreement, the Court is absolutely confident that the settlement agreement arose out of arms-length negotiations conducted in the presence of the Court free of any nefarious influences. And the challenge to the independence of class counsel based on relationships with the retirees' Union is unavailing as there is nothing improper about a union providing funds or other support for a class action on behalf of retirees. Class counsel and the class representatives have adequately represented the interests of the class members. Moreover, the complaint that the objectors' attorneys ('the Chesley Group') were not present during the settlement negotiations fails as "the law does not require the participation in settlement negotiations of other lawyers representing absent class members." *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 155-56 (S.D. Ohio 1992).

- Was the Class Notice misleading and/or inadequate?

A class settlement notice satisfies Fed. R. Civ. P. 23(e) and due process if it:

1. describes the essential terms of the settlement;
2. discloses any special benefits or incentives to the class representatives;
3. provides information regarding attorneys fees;
4. indicates the time and place of the hearing to consider approval of the settlement, and a method for objections to the settlement;

    5. explains the procedures for allocating and distributing any settlement funds and prominently displays the address class counsel and the procedure for making inquiries.

*Mangone v. First USA Bank,* 206 F.R.D. 222, 234 (S.D. Ill. 2001).

The Class Notice in this case meets and exceeds these fundamental requirements.

Moreover, that a bankruptcy risk was raised in the Notice was not misleading because the Notice did not refer to an imminent bankruptcy, but simply recognized the history of the steel industry and the frequent, if not standard, use of bankruptcy to reduce or eliminate legacy costs like retiree health benefits.

Because what "the notice must do is 'fairly apprise the prospective members of the class of the terms of the proposed settlement' so that class members may come to their own conclusions about whether the settlement serves their interests," *UAW v. General Motors Corp.,* 497 F.3d 615, 630 (6th Cir. 2007), the Class Notice in this case was adequate and accurate.

- Is the process for selection of Trustees for the VEBA fatally flawed?

The VEBA will be operated and administered by five trustees – three of whom are class members (the "Retiree Trustees") and two of whom are not class members (the "Public Trustees").

Some objectors claim that there should be not be any Retiree Trustees because they claim that such individuals are not qualified to oversee the VEBA trust. However, it is commonplace for blue collar and service workers to serve as trustees of ERISA funds, and the use of retirees, or other lay personnel, as VEBA health benefit trustees is unexceptional.

Some class members object that the class representatives might appoint themselves to the Retiree Trustee positions for which they will receive remuneration. However, remuneration is capped at a modest $8,000 per year, and, moreover, any class member serving as a VEBA trustee will owe a fiduciary obligation to all other class members requiring, among other things, that s/he use VEBA plan assets only for the benefit of the participants and with the requisite care, skill, prudence, and intelligence required by ERISA. 29 U.S.C. § 1104(a)(1). And the Trustees will be able to hire experts to assist them. Ultimately, the Court is fully comfortable with the common law of trusts, which allows plan participants to serve as trustees. *See Mahoney v. Bd. of Trustees, Boston Shipping Assoc.-Int'l Longshoremen's Assoc.,* 973 F.2d 968, 971 (1st Cir. 1992).

Moreover, there is no requirement in law that trustees be chosen or elected by plan participants. And the objection that the VEBA trustees will be essentially entrenched in their positions and will not be subject to removal for misconduct is inaccurate as trustees can be removed at any time with or without cause by a unanimous vote of the other trustees. (VEBA Trust Agreement § 3.6). This arrangement avoids the problem of trustee entrenchment and satisfies the requirements of ERISA.

Accordingly, the trustee provisions are reasonable.

- Why can't an individual retiree opt out of this class action?

Some objectors complain that they should be permitted to opt out of this class action because they disapprove of the settlement agreement. However, retiree health benefit class actions are routinely brought as mandatory classes, not as opt out's. Here, even if the Court had the authority to permit class members to opt out, the Court would not be inclined to do so. Class members who chose to opt out would not be entitled to keep their benefits. Instead they would have to file a separate lawsuit, pursue years of complex and expensive litigation, and then win at trial and upon appeal. "The extreme odds against a class member getting a better result on his own cannot outweigh the non-objecting majority's interest in preserving the settlement." *Rexam, supra*, 2007 WL 2746595, at *6.

- Is the right to appeal this Court's decision improperly chilled?

Some object to the settlement agreement because after the first payment of $468 million is made to the VEBA, the subsequent three annual payments of $65 million will be placed in an escrow account until final disposition of all appeals. This escrow provision is not unusual and absolutely does not result in any prejudice to the class members because "the assets in the escrow account shall be invested according to the instructions of the VEBA's trustees." (Doc. 51, at § 2.2.2).

Objecting class members have an absolute right to appeal this Court's decision.

-11-

## CONCLUSION

Upon careful review, and pursuant to Federal Rule of Civil Procedure 23(e)(1)(C), the Court finds that the proposed settlement agreement is "fair, reasonable and adequate." Accordingly, the Court grants final approval to the settlement agreement as requested in Docs. 95 & 97.

**IT IS SO ORDERED.**

Date: 2/21/08

Timothy S. Black
United States Magistrate Judge